IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **THEODORE WESBY, et al.,** | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| **vs.** | ) | Civil Action No. 9-cv-501 (RLW) |
| | ) | |
| **DISTRICT OF COLUMBIA, et al.,** | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM OPINION**

In the present action, sixteen Plaintiffs bring claims against the District of Columbia and

five officers (Edwin Espinosa, Jason Newman, Anthony Campanale, Andre Parker and Faraz

Khan) of the District of Columbia Metropolitan Police Department ("MPD").  (Doc. 1, Compl.

¶¶ 19-24.)   In Count I of the complaint, Plaintiffs bring a civil rights false arrest claim pursuant

to 42 U.S.C. § 1983 ("Section 1983") against the five officers in their individual capacities.[1]   In

Count II, Plaintiffs assert a state common law claim for false arrest against the five officers, and

also against the District of Columbia ("District") on the basis of *respondeat superior*.  Count III

alleges negligent supervision solely against the District.

Presently before the Court are cross motions for summary judgment. The Defendants

seek summary judgment on all claims.  (Doc. 31.)  Plaintiffs likewise seek summary judgment on

---

[1]  Plaintiffs originally brought the Section 1983 claim against the officers in their official
capacities as well, but Plaintiffs have now clarified that they are proceeding against the officers
solely in their individual capacities.  (Doc. 33, Pls.' Summ. J. Response 4.)  Therefore, all of
Plaintiffs' Section 1983 official capacity claims will be dismissed with prejudice.

all claims.  (Doc. 25.) [2]

For the reasons set forth below, the Court finds that both motions are due to be granted in part and denied in part.

# I. FACTS

A.     **Overview**

The overall facts are generally undisputed.  In the early morning hours of Saturday, March 15, 2008, Plaintiffs were attending a gathering at 115 Anacostia Avenue, N.E.,  in Washington, D.C. [3]  At approximately 1:30 a.m., officers from the D.C. Metropolitan Police Department (MPD) arrived at the house in response to a call about the property.  The officers entered the residence and spoke to the Plaintiffs, an assortment of twenty-one men and women (sixteen of whom are Plaintiffs in this action).  Several of the women were scantily dressed and had currency tucked into their garments.  None of the Plaintiffs owned the home, but one or more of the Plaintiffs informed one or more of the police officers that a woman named

---

[2]  The electronic docket entries for Plaintiffs' pleadings in opposition to Defendants' motion and in support of Plaintiffs' motion specifically list some, but not all, of the sixteen Plaintiffs.  (*See* Doc. 25, 32.)  Defendants therefore seek dismissal of all claims asserted by the Plaintiffs who were not listed on the electronic docket.  While it would have been preferable if Plaintiffs had addressed this issue in their briefs, the Court is not willing to dismiss the claims asserted by some Plaintiffs based solely on notations that appear on the electronic docket, particularly since the text of Plaintiffs' pleadings indicate that they were filed on behalf of all Plaintiffs, Plaintiffs' arguments are not specifically tailored to each individual Plaintiff, and the Defendants cite no rule or precedent indicating that the failure to list every Plaintiff in the text of the electronic docket entry justifies such drastic relief.

[3]  Although the complaint, (Compl. ¶ 25), and Defendants' undisputed facts, (Defs' Statement of Facts #8), indicate that the property was located on "Anacostia Road," the police report and property records indicate that the property is located on "Anacostia Avenue."  (Defs.' Exs. A, E.)

"Peaches"[4] had invited the Plaintiffs to the house for a bachelor party.  When an officer spoke to Peaches via telephone, she indicated she had given the Plaintiffs permission to hold a bachelor party at the house.  However, the officer later spoke to the purported owner of the home and he indicated that, while he had discussed leasing the property to Peaches, she did not have a lease for the property and that the Plaintiffs did not have his permission to be in the house.

At some point during the investigation, Sergeant Suber arrived at the house and took control of the situation.  Upon learning that Peaches did not have permission from the owner to occupy the property, Sgt. Suber made the decision to arrest the Plaintiffs for unlawful entry.[5] Suber is not a defendant in this action.

After Plaintiffs were taken to the police station, they were eventually released at the direction of the watch commander, Lieutenant Netter, who disagreed with Suber's decision regarding the unlawful entry arrests.  Before the Plaintiffs could depart, however, Netter ordered the arrest of Plaintiffs for disorderly conduct[6] for using "loud voices," based on advice or direction from a representative of the District of Columbia Office of the Attorney General ("Attorney General" or "OAG").  Neither Lieutenant Netter nor the attorney from the OAG have been named as Defendants in this action.

Although Suber objected and informed Netter that the disorderly conduct charge was not appropriate, Netter failed to reverse his decision.  Suber and the other officers who were at the scene have since testified that they did not observe any activities consistent with a disorderly

---

[4] Apparently Peaches also goes by the name "Tasty."  (*See* Doc. 31, Defs.' Summ. J. Br. 6; Hunt Dep. 8-9; Chittams Dep. 11-12.)

[5] *See* D.C. Code § 22-3302.

[6] *See* D.C. Code § 22-1321.

conduct charge. Between the time spent detained at the house, at the police station, and in lock up on the disorderly conduct charges, each Plaintiff was in police custody a total of several hours. The disorderly conduct charges were later dropped as to each Plaintiff.

That was a summary. Because the role of each officer, the reasonableness of each officers' actions, the state of the collective knowledge of the officers, and other particularized issues have been raised, set forth below are more detailed descriptions of the evidence from the accounts of several key police officer witnesses and an arrest report.

**B.      Sergeant Andre Suber**

Sergeant Suber admits he made the decision to arrest the Plaintiffs for unlawful entry on the night in question. (Suber Dep. 24.) After some of the officers had already entered the property, Sergeant Suber arrived at the scene and entered the house, which had working electricity. (Suber Dep. 11.) In the course of his debriefing, he asked the officers if the owner of the property was on the scene and they said no. (Suber Dep. 17.) He then asked those present if someone was renting the house and "they" began to tell him about Peaches who "claimed to be renting the house," but no one present could provide proof of such rental and Peaches was not on the scene. (*Id.* 17.) Suber then asked who gave the Plaintiffs permission to entertain at the house and "no one at the location could provide [him] a name or number of an owner. They only gave a name of . . . Peaches." (*Id.* 18.) Suber further testified:

> A:      We called Peaches several times on the phone, a female. We asked her, "Who gave you permission to be inside this house?" She said no one. She said she was possibly renting the house from the owner who was fixing the house up for her. <u>And that she gave the people who were inside the place, told them they could have the bachelor party</u>.

4

. . . .

I asked her again who gave her permission to give them permission to come into an establishment or house that's not under her control.  The [sic] she became evasive and hung up the phone.

. . . .

I called her back.  She again began yelling and saying she had permission - - she didn't know the owner's name, but she had permission to be inside the residence because she was going to rent the place out.  Then she hung up. . . . [We got her on the telephone again and] she stated that she didn't have permission to be inside the location.  <u>At that time they all were there unlawfully.</u>

Q.    So she told them that they could be there right?

A.    Yes.

Q.    Okay.  And then you all determined that she didn't have the right to tell them that they could be there right?

A.    Yes, sir.

Q.    And then because she told them - - gave them misinformation, you then arrested the people who thought they had a legal right to be there?

A.    If a person comes to a location, it's upon them, their responsibility, to find out if they can in fact be at the residence lawfully.

. . . .

Q.    <u>And it did not matter whether or not they believed, based on what Peaches told them, that they had a right to be there?</u>

A.    <u>Peaches nor the other individuals occupying that location did not have the right to be there.</u>

(*Id*. 18-19, 39) (emphasis added).

Around the time of the arrests Suber apparently informed the night watch commander, who was at another location, about the course of events and she was "okay" with his "decision" to arrest Plaintiffs for unlawful entry.  (Suber Dep. 31.)  Around 5:00 a.m., the next watch commander, Lieutenant Netter, came on duty at the precinct.  (*Id*. 28, 31.)  While the order of

5

events is somewhat unclear, Netter consulted with other upper level officers and decided he was going to release the Plaintiffs, to which Suber responded by providing Netter with the unlawful entry statute. (*Id*. 28-29.) Netter decided "he didn't care, and that he was going to release these people," to which Suber responded "You're the watch commander, I'm a sergeant, you have that authority and I don't." (*Id*. 28-29**,** 39-40.)

At some juncture, Netter again consulted with two other upper level officers and they telephoned the Attorney General's office. (Suber Dep. 40-41.) As the Plaintiffs were being released and were getting their belongings from the front counter, Suber is told that someone from the Attorney General's office said "Lock them up for disorderly conduct, loud voices." (*Id*. 29-30, 41.)

Suber, however, was of the opinion that the disorderly conduct charge did not fit the circumstances because "you can't be disorderly inside of a house" and there was no evidence that the Plaintiffs had become loud or boisterous causing people to wake up, turn on their lights, and/or come outside to investigate a commotion. (*Id*. 42-43.) Although the details of the entire conversation are not in the record, Suber testified he told Netter that the disorderly conduct charge was not "an appropriate charge," but Netter indicated that as watch commander he was going to charge the Plaintiffs. (*Id*. 42-43.) Suber walked out and the Plaintiffs were then gathered and processed for disorderly conduct. (*Id*. 43, 30.)


**C.      Defendant Officer Andre Parker**

At one point in Officer Parker's deposition, he testified that prior to his arrival at the scene a call went out for assistance at the house because "there was some unlawful people inside

of this home." (Parker Dep. 10.)  At another point he testified

> there was a call.  The call that came out was for a loud party at the location.  And
> there had been like previous calls to that house that there were some - - I mean,
> I've heard officers have talked about that there was some - - a lot of partying
> going on at this particular location over course of time [sic].

(Parker Dep. 11.)  Parker further testified that the person who called the precinct indicated there

was illegal activity going on at the house and this information was passed on to the officers.

(Parker Dep. 17.)  At some point, he was told the "house was due to be vacant. It was a vacant

home. And no one had permission to be there."  (*Id*. 11.)

Once he entered the house, he observed individuals holding cups and he went upstairs

where he observed women dressed "provocatively" with money in their garters.  (Parker Dep.

14.)  He also smelled marijuana and searched for illegal narcotics, but did not find any illegal

narcotics and observed no illegal activity.  (Parker Dep. 14-15, 17, 20.)  Inside the house Parker

observed a mattress, along with lighted candles, but testified he did not see "any furniture."

(Parker Dep. 14-15.)

While the officers were investigating the scene, all of the "individuals were asked who

the owner of the house was and where the owner was." (Parker Interrog. 2.)  One of the Plaintiffs

told Parker "that her friend Peaches had allowed her - - Peaches was throwing the party," but

Peaches was not at the residence.  (Parker Dep. 15-16.)  Either this same Plaintiff or one of the

other Plaintiffs also told Parker that Peaches was renting the house from the grandson of the

owner, who had recently passed away, and that the grandson had given permission for the

individuals to entertain in the house.  (Parker Interrog. 2.)

Parker asked one of the Plaintiffs to get Peaches on the telephone and to ask her to come

back to the house to clear things up by bringing "a lease or something."  (Parker Dep. 15-16.)

Eventually, Parker spoke to Peaches and she told him that she had just left the house and that she would not return because she was afraid of being arrested.  (Parker Interrog. 3.)  Peaches did indicate that the grandson of the owner had given her permission to occupy the property and that Parker could confirm this.  (Parker Interrog. 3.)  Parker then spoke to "Hughes,"[7] who told Parker nobody had permission to be in the house.  (Parker Dep. 17-18; Parker Interrog. 2.) Hughes indicated he and Peaches were in the process of working out a leasing arrangement, but they never reached an agreement.  (Parker Dep. 17-18.)

Upon learning of this information, Sergeant Suber made the decision to arrest Plaintiffs for unlawful entry.  (Parker Dep. 18-19.)  When asked if he was familiar with the law regarding unlawful entry at the time of the arrests, Parker responded "Yes."  (Parker Dep. 31.)  He testified the arrests were made because Peaches was reluctant to come back and "[b]ecause one person said they didn't have the right, and one person said they did have the right."  (Parker Dep. 19, 31-32.)  "It was stated that because it was not clear who the owner of the house was and whether or not permission was given to the individuals to be in the house at the time of the occurrence Sergeant Suber ordered that all the individuals be arrested."  (Parker Interrog. 2.)

Parker testified that he did not place anyone under arrest or complete any of the paperwork.  (Parker Dep. 20.)  He did, however, provide the information he obtained from Peaches and Hughes "to the officers that took [the] arrest."  (Parker Dep.  20.)  In one of his

_____

[7]  Defendants have introduced property records indicating that a Henry Hughes Jr. owned the house until his death in April 2007, about one year prior to the arrests.  (Defs.' Ex. E.) Damion Hughes was the personal representative of the decedent at the time of the arrests, and he sold the property about six months after the arrests.  *Id.*

interrogatory responses he indicates he does not know who arrested the Plaintiffs, but in another

interrogatory response he recalls that Officers Khan and Newman made arrests.  (Parker

Interrog. 12, 20.)  There were other officers at the scene, but he does not recall all of their names.

(Parker Interrog. 5, 12; Parker Dep. 13.)

Parker did not observe anything at the scene that constituted disorderly conduct.  (Parker

Dep. 32, 34.)


**D**.      **Defendant Officer Anthony Campanale**

Officer Anthony Campanale and Officer Parker were on patrol the night of the arrests

when they received a call from Officer Jarboe who indicated "there were people in a house at

115 Anacostia Avenue, NE."  (Defs. Ex. P, Campanale Interrog. 2.)  Upon arriving at the house,

Officer Jarboe told Campanale and Parker that "the people in the house should not be there.  He

also told [them] that he had received information from neighbors that this was an ongoing

problem.  Officer Jarboe further stated that the neighbors had advised him that the house was

abandoned and nobody should be in it."  (*Id*.)  After entering the house, Campanale observed

some individuals holding cups of liquor and beer and he could smell marijuana.  (*Id*.)  He "also

observed female [sic] provocatively dressed with dollar bills in a garter belt around their leg."

(*Id*.)

Campanale began taking pictures, during which time Sergeant Suber arrived.

(Campanale Interrog. 2.)  When the occupants were asked who gave them permission to be in the

house, plaintiff Natasha Chittams indicated "Peaches" gave them permission.  (*Id*.)  Later,

Campanale was informed by Officer Parker that he spoke to Peaches.  (Campanale Dep. 35;

9

Campanale Interrog. 2.)  Officer Parker told Campanale that, although Peaches allegedly had permission to use the residence, she could not return to the scene and could not identify the owner.  (Campanale Dep. 35; Campanale Interrog. 2.)  Further, Campanale observed that none of the other occupants "could say who gave them permission to be in the house."  (Campanale Interrog. 2.)  Instead, they said they were present at the "invitation of somebody else." (Campanale Interrog. 9.)

In his interrogatory responses, Campanale explains that "individuals were handcuffed and arrested for unlawful entry," but he does not know who did so.  (Campanale Interrog. 19-20.)  In his deposition, however, he says he arrested someone for unlawful entry because they did not have permission to be inside the residence, but he does not remember who he arrested or whether the individual was male or female.  (Campanale Dep. 35, 37.)  When asked how he made the unlawful entry determination, Campanale testified that Officer Parker told Campanale and Sergeant Suber about Parker's conversation with Peaches.  (Campanale Dep. 35.)  Based on that information, "we believed we had probable cause to place the individuals under arrest for unlawful entry.  Nobody could determine who was supposed to be inside the residence."  (*Id.*) When asked his understanding of what constitutes unlawful entry, he replied "you're present inside of a location that you do not have permission to be in."  (*Id.* 35.)  Later, he gave his arrest reports to Officer Phifer because the officers "were at check-off point," and the supervisors were not allowing the officers to "stay past [their] tour."  (*Id.* 41.)

Campanale did not observe any conduct that would support a charge of disorderly conduct.  (Campanale Dep. 41-42.)  According to Campanale, the other four defendants were at the scene along with other officers.  (Campanale Interrog. 5.)

E.      **Defendant Officer Edwin Espinosa**

On the night of the arrests, Espinosa was partnered with his training officer, Master

Patrol Officer Gregory Phifer, who had a conversation with Officer David Jarboe.  (Espinosa

Interrog. 2.)  Espinosa does not know the substance of the conversation, but he and Phifer left the

precinct and drove to the house.  (*Id*.)  Although the arrest report indicates Espinosa heard "loud

music" prior to entering the house, when asked to give a statement of facts surrounding the arrest

of Plaintiffs, Espinosa's interrogatory responses make no mention of hearing music, much less

loud music.  (Espinosa Interrog. 2.)  Upon entering the house, he did not observe any illegal

activity.  (Espinosa Dep. 11.)  The Plaintiffs were asked "if there was an owner to the apartment

or to that residence," and when that question was not answered, Officers Phifer and Jarboe tried

to determine if anyone knew the owner and the Plaintiffs "came up with no answer."  (Espinosa

Dep. 11-12.)  Espinosa does not know who made the decision to arrest the Plaintiffs or who

actually arrested them, but he did not question, search, detain or handcuff any of the individuals

or tell them they were under arrest.  (Espinosa Dep. 12; Espinosa Interrog. 2, 16, 20.)

He and Officer Phifer later returned to the precinct where Espinosa completed three

arrest forms "by copying the individuals [sic] information from the MPD form 256."  (Espinosa

Dep. 12.)  He also signed the forms, but he did not complete the narrative and he did not obtain

any information from any of the officers prior to handling the paperwork.  (Espinosa Interrog. 2;

Espinosa Dep. 12, 21.)  Phifer gave Espinosa the assignment for completing the forms.

(Espinosa Interrog. 19.)

In addition to Officer Phifer, Espinosa recalls seeing Officers Khan and Jarboe at the

scene, but he does not recall which other officers were present.  (Espinosa Interrog. 4, 12.)  He

did not observe any activity that would support a charge of disorderly conduct.  (Espinosa Dep. 22.)

**F.      Defendant Officer Faraz Khan**

Khan was riding with training Officer Jarboe on the night of the arrests.  (Khan Interrog. 2.)  Jarboe and Phifer had a conversation about going to the house, but Khan does not recall the particulars of that conversation.  (*Id.*)  Once at the house, he saw "females dressed only in their bra and thong with money hanging out their garter belts."  (*Id.*)  Khan stayed in the living room. (*Id.*)  At no point did he observe any drugs or illegal conduct.  (Khan Dep. 12.)

He does not recall who made the decision to arrest the Plaintiffs, but he did not detain or arrest any of the Plaintiffs.  (Khan Interrog. 2, 19.)  Later he returned to the precinct and began to "process" the Plaintiffs by completing six or seven arrest forms.  (Khan Interrog. 2; Khan Dep. 12.)  Although Officer Phifer wrote the narrative, Khan completed the front page and signed the forms, but he does not remember who told him to sign.  (Khan Interrog. 2, 7, 19.)  Khan testified that because he was in training, his training officer "gave" him the arrests, but at the time he began completing the paper work he did not know the basis of the arrest charge.  (Khan Dep. 12-13, 15.)  Later, prior to signing the form, he found out from Jarboe that the Plaintiffs "did not have permission, right to be in that house and they're going to be charged with unlawful entry." (Khan Dep. 15.)  Other than the information from Jarboe, Khan did not have any information that would substantiate a charge for unlawful entry and he does not know how the decision was reached.  (Khan Dep. 13, 15-17.)  Indeed, he did not observe anything that led him to believe that Plaintiffs did not have the right to be there.  (Khan Dep. 17.)

In addition to Defendants Campanale, Newman, and Espinosa, Khan recalls seeing other officers on the scene, but he does not know who assisted with the arrests of Plaintiffs.  (Khan Interrog. 5, 12.)

He did not observe anything at the scene that would support a disorderly conduct charge. (Khan Dep. 16.)

## G.      Defendant Officer Jason Newman

When Officer Newman entered the property, he observed officers speaking to individuals on the first floor.  (Newman Interrog. 2.)  Newman went upstairs and found a male "hiding in a closet, one female may have been in the bathroom and another female was just standing in the bedroom."  (*Id.*)  These persons went downstairs at the direction of the officers and, at some point, Sergeant Suber arrived and someone explained to him "what was going on."  (*Id.*) Newman remembers officers asking who lived in the house, but the individuals were unable to answer the questions, at which time Suber made the decision to arrest the individuals for unlawful entry.  (*Id.*)

In addition to Suber and the other four Defendants, Newman remembers seeing several other officers on the scene, but he does not know if any assisted with the arrest of Plaintiffs. (Newman Interrog. 5, 12.)  Sgt. Suber ordered Newman to make an arrest.  (Newman Interrog. 19.)  Newman believes the person he arrested was Ethelebert Louis.  (*See* Newman Dep. 15-16.) Newman testified that Louis

> was an individual I basically attached my name to with an arrest. There were a lot of people being arrested.  So at this point you just, "This is your guy you're arresting; Officer this is your guy you're arresting." . . .  You just - - arrest this person, next person is this officer's.  Because there's so many people, one officer can't take all

13

[of the Plaintiffs].

(Newman Dep. 16.)  When asked the basis for the arrest, Newman responded "no one knew who

the owner was. . . .   [Louis] did not know who the owner was." (Newman Dep. 20.)  Newman

did not observe anything at the scene that would justify a disorderly conduct charge.  Indeed, he

did not observe any illegal conduct.  (Newman Dep. 12, 24.)


**H**.      **The Arrest Form**

Defendants admit one or more of them are listed as the "Arresting Officer" on each of the

Plaintiffs' arrest forms.  (Doc. 31, Defs.' Summ. J. Brief 8.)  However, the record contains only

one of those "Arrest/ Prosecution Report" forms and it lists Cory Bonds as the arresting officer

and Newman as an assisting officer.  (Defs.' Ex. A.)  The name of the arrestee is blacked out on

the arrest form filed with the Court.  (*Id*.)

The narrative on the second page explains that the police responded to the house to

"investigate a complaint of illegal activities which generated from inside of the event location.

The information came from a former ANC commissioner, W-1.  W-1 also stated, the listed

property has been vacant for several months." (*Id*.)  Although the form lists "Foster" as

complainant/witness 1, there is no statement in the record from "Foster."

"Keck" is listed as complainant/witness 2.  The record contains a declaration from Randy

Keck, who lives three doors down from the house at issue.  (Defs.' Ex. O, Keck Decl. ¶ 1.)  Keck

declares in his undated statement that he "thought" the house was vacant and that about one

month prior to the arrests he began to notice many cars parked outside the residence, as well as

along the block.  (*Id*. ¶¶ 3-4.)  However, he does not indicate what information he provided to the

14

police prior to the arrests about what occurred on the night in question. [8]

The narrative on the form indicates that Officer Phifer and Defendant Espinosa heard loud music coming from inside the house upon arrival, although Espinosa did not mention hearing any music when asked via interrogatory to explain the facts surrounding the arrest of the Plaintiffs.  (Defs.' Ex. A; Espinosa Interrog. 2.)  According to the arrest report, once inside the house, Defendant Parker found marijuana.  (*Id*.)  However, there is nothing in the record indicating the officers found illegal drugs at the scene.  Moreover, Officer Parker testified that, while he smelled marijuana in the air, no drugs were found in the home.  (Parker Dep. 14-15.) The report indicates that the home

> was in disarray which is also consistent with it being a vacant property.  Further investigation revealed no one could be located as having given permissing [sic] to occupy the listed property.

(Def.'s Ex. A.)  Finally, the report lists the charge as unlawful entry in typeface, but that charge is crossed out and disorderly conduct was handwritten onto the form.  (*Id*.)

In addition to the non-defendant officers, the arrest report notes the involvement of Defendants Newman, Espinosa, Khan and Parker in the investigation at the scene.  (*Id*.)

## II.  STANDARD OF REVIEW

Summary judgment is appropriate when the moving party demonstrates that there is no

---

[8]  The record also contains a "Complaint/Witness Statement" from an individual with an unidentified first name and the last name of Waters.  (Defs.' Ex. C.)  This individual observed "a lot of people going into the house next door," people being searched prior to entering the house, and ladies with overnight bags.  (Defs.' Ex. C.)  This unsigned and undated statement does not indicate that the house was vacant, that police were informed it was vacant or when the witness shared her observations with the police.  (*See id*.)

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  *See Moore v. Hartman,* 571 F.3d 62, 66 (D.C. Cir. 2009) (citing Fed. R. Civ. P. 56(c)); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986)).  A genuine issue of material fact exists if the evidence, viewed in the light most favorable to the non-movant, "is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.  A non-moving party, however, must provide more than "a scintilla of evidence" in support of its position; the quantum of evidence must be such that a jury could reasonably find for the non-moving party.  *Id.* at 252.

Here, both parties have moved for summary judgment.  Thus, the Court must analyze the Defendants' motion (including the qualified immunity defenses) while viewing the facts in the light most favorable to the Plaintiffs, and, alternatively, analyze the Plaintiffs' motion while viewing the facts in the light most favorable to the Defendants.  *See Johnson v. District of Columbia*, 528 F.3d 969, 973-78 (D.C. Cir. 2008).

### III.  PROBABLE CAUSE

In this case, each of the Plaintiffs' three claims is predicated upon the allegation that the Plaintiffs were arrested without probable cause.  If the police had probable cause to arrest the Plaintiffs, then all three claims fail.  Thus, the Court will review this question first.

When the Plaintiffs were arrested at the Anacostia Road house, the basis for the arrest was their alleged violation of the unlawful entry statute.  Sometime after the Plaintiffs were taken to the police station, the basis for the arrest changed to their alleged violation of the disorderly conduct statute.  Accordingly, the Court will review each of the two grounds for arrest

separately.


A.      **Unlawful Entry**

In the instant case, even when considering the facts in the light most favorable to the

Defendants, it is clear that Plaintiffs were arrested for unlawful entry without probable cause.

Under District of Columbia law, a Plaintiff violates the unlawful entry statute when she enters

private property "without lawful authority" and "against the will of the lawful occupant or of the

person lawfully in charge."  D.C. Code § 22-3302 (a)(1).  It is well settled that "[t]o be against

the will of the lawful occupant the entry must be against the expressed will, that is, after warning

to keep off."  *Bowman v. United States*, 212 A.2d 610, 611 (D.C. 1965); s*ee also Darab v.*

*United States*, 623 A.2d 127, 136 (D.C. 1993) ("When a person enters a place with a good

purpose and a bona fide belief in his or her right to enter, that person lacks the requisite criminal

intent for unlawful entry. . . . "); Barbara E. Bergman, *Criminal Jury Instructions for the District*

*of Columbia* § 5.401 (Matthew Bender, Rev. Ed.) (unlawful entry requires proof that the accused

"knew or should have known that s/he was entering against the person's will").

In the instant case, the evidence is undisputed that the Plaintiffs were expressly or

impliedly invited onto the property by a woman named "Peaches" and that several of the police

officers were aware of this invitation.  Most importantly, it is undisputed that Sergeant Suber

made the decision and gave the order to arrest the Plaintiffs for unlawful entry and that he did so

even though he was aware that the Plaintiffs were on the property at the invitation of Peaches.

While it turns out that Peaches may not have had the authority to invite guests to the house,

nothing about what the police learned at the scene suggests that the Plaintiffs "knew or should

have known that [they were] entering against the [owner's] will." *See* Criminal Jury Instructions § 5.401.

Even though there is evidence that one or more neighbors told the officers that the property was supposed to be vacant, this is not a case where the property was boarded up, door latches were broken, no trespassing signs were posted or the manner of securing the property indicated that the owner wanted others to keep out. *See* D.C. Code § 22-3302 (a)(1).[9] Indeed, although the house was in disarray, it is undisputed that the electricity was working, the property contained a mattress, candles, chairs, food, and the bathrooms were functional. (Suber Dep. 11; Parker Dep. 14-15; Louis Dep. 28; Chittams Dep. 27-28, 30-33.) Thus, the neighbors' statements, that the property was "supposed to be" vacant, were insufficient under the circumstances to establish probable cause to believe that the Plaintiffs had been told not to enter by the owner or that the Plaintiffs knew or should have known that they had entered the property against the owner's will. *Compare Jones v. United States,* 282 A.2d 561, 562-63 (D.C. 1971) (defendant lawfully arrested inside vacant apartment building where police discovered broken latch and an opened door with a damaged door panel upon arrival); *Culp v. United States*, 486 A.2d 1174, 1175-77 (D.C. 1985) (officers had probable cause to believe intruders had entered against the express will of the owner where at least some windows on the property were boarded

---

[9] "The presence of a person in any private dwelling, building, or other property <u>that is otherwise vacant and boarded-up or otherwise secured in a manner that conveys that it is vacant and not to be entered, or displays a no trespassing sign</u>, shall be prima facie evidence that any person found in such property has entered against the will of the person in legal possession of the property." D.C. Code § 22-3302 (a)(1) (2007) (emphasis added). Thus, mere presence in a supposedly vacant building, if the building is not boarded up or displaying a "no trespassing" sign, is not prima facie evidence that the entry into the building was against the will of the owner.

up, the property owner had diligently attempted to keep the windows boarded and the intruder

had no explanation for his presence on the property);  *Best v. United States*, 237 A.2d 825 (D.C.

1968) (officer had probable cause where intruder could not provide a logical explanation for his

presence in building and the building manager told the officers at the scene that the building was

generally kept locked and the public was not invited to enter).

Finally, while Officer Parker's conversation with "Hughes" may have provided evidence

that the Plaintiffs did not have permission to remain on the property, the conversation did not

provide evidence that Plaintiffs had been warned to stay off of the property or should have

known they were not welcome at the time of their entry onto the property.  Such evidence is

essential to establish probable cause for unlawful entry.  *See District of Columbia v. Murphy*,

631 A.2d 34, 38 (D.C. 1993) (finding no evidence of probable cause to arrest for unlawful entry

where it was undisputed that the apartment owner told the responding officers she wanted her

boyfriend to leave, but she never told the officers that she "actually had <u>asked</u> [the boyfriend] to

leave [prior to the officers' arrival] and that he had refused.") (emphasis in original), *aff'd on

rehearing*, 635 A.2d 929 (1993).

Accordingly, the officers did not have probable cause to support the unlawful entry

arrest.  Indeed, Suber and three of the defendants erroneously believed that proof of intent to

enter the property against the owner's will was unnecessary, contrary to the long-established

precedent described above.  (*See* Suber Dep. 39; Parker Dep. 19, 31-32; Parker Interrog. 2;

Campanale Dep. 35; Newman Dep. 20.)

B.     **Disorderly Conduct**

Similarly, even considering the evidence in the light most favorable to the District, the Court finds that the arrests for disorderly conduct were made without probable cause.

Indeed, the District made no serious attempt in its pleadings to explain how the determination was made that probable cause existed for the offense of disorderly conduct, effectively conceding the issue.[10]   The testimony placed into the record by every single police officer who was present on the scene indicated that they did not witness any conduct that justified the disorderly conduct arrests.   (Pls' Statement of Undisputed Facts ¶ 1; Defs.' Resp. to Pls.' Statement of Undisp. Facts ¶ 1.)   The Defendants have not presented any evidence from Lt. Netter, who ordered the arrests, or from the unidentified representative from the Office of the Attorney General, who advised Netter that the arrests were proper.   Despite six rounds of briefings on the two motions for summary judgment, the Defendants have made no substantive effort to set forth what specific facts were relied upon by Netter or the Attorney General's representative and how any such facts established probable cause to arrest each of the Plaintiffs for disorderly conduct.

The only evidence presented about how or why the decision was made to arrest the Plaintiffs for disorderly conduct came from Sgt. Suber, who testified that Lt. Netter said he was told by the OAG representative that he could arrest the Plaintiffs for disorderly conduct based on "loud voices."   (Suber Dep. 29-30, 41.)   While there was evidence in the record that the police were told of reports of a loud party or loud music and some officers heard loud music upon

---

[10]   As described below, the District instead relied upon absolute immunity and other arguments to defend against liability for the disorderly conduct arrests.

arrival, there was no evidence that the police were told of "loud voices" or of noise that was so unreasonably loud or sustained for such a lengthy period of time as to justify the arrests for disorderly conduct based on then-existing D.C. Code § 22-1321(3).[11]  *See In re T.L.*, 996 A.2d 805, 814 (D.C. 2010) (to find a violation under § 22-1321(3), prohibiting a "breach of the peace" by "shout[ing] or mak[ing] a noise either outside or  inside a building during the nighttime to the annoyance or disturbance of any considerable number of persons," the court "stress[es] the government's burden of showing that the noise was <u>unreasonably</u> loud under the circumstances") (emphasis in original).  While their testimony indicates that some of the officers operated under the erroneous belief that "a person cannot be disorderly inside a house," none of them testified that they observed "unreasonably loud," sustained noise that "disturbed a considerable number of persons" when they arrived on the scene.

Furthermore, following a request by the Court for copies of the disorderly conduct charging documents, the record was supplemented with copies of the judicial summonses filed against Plaintiffs Taylor, Chittams, Richardson, Davis, and Louis.  (Doc. 37.)  Based on those summonses, it appears that Defendants did not even rely upon then existing D.C. Code § 22-1321(3) to make the arrests.  Rather, each summons cited D.C. Code § 22-1321(1) as the basis for the disorderly conduct charge.  (*Id.*)  Pursuant to the then-existing version of D.C. Code § 22-1321(1), which prohibited a "breach of peace" by "act[ing] in such a manner as to annoy, disturb, interfere with, obstruct, or be offensive to others," an arrest would have required evidence that each of the Plaintiffs used words likely to produce violence.  *See Shepherd v. District of Columbia*, 929 A.2d 417, 418-19 (D.C. 2007).  Defendants have offered no such

---

[11] Effective 2011, the disorderly conduct statute was significantly amended.

evidence here.

Additionally, whether viewed pursuant to § 22-1321(1) or § 22-1321(3), Defendants have made no attempt to proffer evidence that probable cause existed that would justify the arrest of each individual Plaintiff for disorderly conduct, as required by the Fourth Amendment. *See Ybarra v. Illinois*, 444 U.S. 85, 91 (1979) ("[A] person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause . . . . [A] search or seizure of a person must be supported by probable cause particularized with respect to that person. This requirement cannot be undercut or avoided by simply pointing to the fact that coincidentally there exists probable cause to search or seize another . . . .") (citations omitted); *Barham v. Ramsey*, 434 F.3d 565, 573 (D.C. Cir. 2006) ("Even assuming that Newsham had probable cause to believe that some people present that morning had committed arrestable offenses, he nonetheless lacked probable cause for detaining everyone who happened to be in the park. It is firmly established that, to comport with the Fourth Amendment, a warrantless search or seizure must be predicated on particularized probable cause.") (citing *Ybarra*, 444 U.S. at 91). [12]

---

[12] Moreover, there is no evidence or credible suggestion in this case that the police were confronted by a riotous mob or any other exigency that could justify these arrests based on less than particularized probable cause. *Compare Washington Mobilization Committee v. Cullinane*, 566 F.2d 107, 116, 120 (D.C. Cir. 1977) (where Plaintiffs' who were arrested for disorderly conduct challenged their mass arrests because some demonstrators were not guilty of violence and some Plaintiffs were not demonstrators, the Court explained that "the police cannot be expected to single out individuals; they may deal with the crowd as a unit" when "confronted with a mob"); *Carr v. District of Columbia*, 587 F.3d 401, 408 (D.C. Cir. 2009) (rejecting the lower court's finding that the police lacked particularized probable cause to arrest all of the protestors, the appellate court reasoned that "A requirement that the officers verify that each and every member of a crowd engaged in a specific riotous act would be practically impossible in any situation involving a large riot, particularly when it is on the move-at night.").

Thus, the Court finds that the undisputed facts compel a finding that Plaintiffs were arrested without probable cause for unlawful entry and disorderly conduct. We now turn to an analysis of each of the three causes of action, and the defenses applicable to each.

## IV.  SECTION 1983 - FOURTH AMENDMENT CLAIMS

To establish a claim against the police officers under 42 U.S.C. § 1983, Plaintiffs must demonstrate that the officers, while acting under color of state law, deprived the Plaintiffs of "rights, privileges, or immunities secured by the Constitutions and laws" of the United States. 42 U.S.C. § 1983.  The complaint alleges that the police officers violated Plaintiffs' Fourth Amendment rights by arresting them without probable cause to believe that they had committed a crime.  As shown above, the Plaintiffs have proven that they were arrested without probable cause.  Thus, the Plaintiffs have proven the basic elements of their Section 1983 claim.

In response to Plaintiffs' Section 1983 claim against the officers in their individual capacities, the Defendant officers assert a qualified immunity defense.  "Although government officials may be sued in their individual capacities for damages under § 1983 . . ., qualified immunity protects officials from liability insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Atherton v. District of Columbia Office of Mayor*, 567 F.3d 672, 689 (D.C. Cir. 2009) (internal citation marks omitted) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  While the question is not entirely free from doubt, it appears that the burden of proving qualified immunity rests with the Defendants.  *See Reuber v. United States*, 750 F.2d 1039, 1058 n.25 (D.C. Cir. 1984).  Thus, as to the defense motion for summary judgment, the Court must first determine

whether the facts, construed in the light most favorable to the injured parties, show that the

officers violated a constitutional right, and second, whether that constitutional right was clearly

established at the time of the incident.  *See Barham v. Salazar*, 556 F.3d 844, 847 (D.C. Cir.

2009).  If the answer to either of these questions is no, then the defense motion for summary

judgment must be granted because the officers are entitled to qualified immunity.[13]

As to answering the second question, our Circuit Court has recently explained:

> In a suit alleging arrest or prosecution in violation of the Fourth Amendment, a defendant who mistakenly concludes that probable cause is present is nonetheless entitled to qualified immunity if a reasonable officer could have believed the arrest to be lawful, in light of clearly established law and the information the arresting officers possessed.  Such a reasonable if mistaken belief that probable cause exists is sometimes termed "arguable probable cause."

*Moore v. Hartman*, 644 F.3d 415, 422 (D.C. Cir. 2011) (citations and some quotation marks

omitted); *see also* Sheldon H. Nahmod, *Civil Rights and Civil Liberties Litigation: The Law of

Section 1983* § 8.24 (4th ed.).  When considering Plaintiffs' motion for summary judgment, the

Court will review the evidence in the light most favorable to the Defendants.

## A.     Unlawful Entry Arrests & Defendants' Qualified Immunity Defense

With these principles in mind, the Court turns to the Section 1983 claim based on the

arrest of the Plaintiffs for unlawful entry.  Subsequently, the Court will consider the Section

1983 claim based on the arrest of the Plaintiffs for disorderly conduct.

---

[13]  This Court may exercise its discretion to decline determining whether the officers violated a constitutional right if it appears doubtful that any such right, even if it existed, was clearly established at the time of the incident.  *See, e.g. Jones v. Horne*, 634 F.3d 588, 597 (D.C. Cir. 2001) (citing *Pearson v. Callahan*, 555 U.S. 223, 236-37 (2009)).  Here, the Court deems it appropriate to address both questions.

      1.      <u>Plaintiffs' Constitutional Rights Were Violated</u>

As stated above, the Court finds that the Plaintiffs were arrested for unlawful entry without probable cause, which violated their rights under the Fourth Amendment.

      2.      <u>The Constitutional Rights At Issue Were Clearly Established</u>

Having established that Plaintiffs' constitutional rights were violated, this Court "must determine 'whether the right was clearly established' at the time of the alleged violation." *Bame v. Dillard*, 637 F.3d 380, 384 (D.C. Cir. 2011) (citations omitted).  When determining whether a given constitutional right was "clearly established" for the purposes of establishing qualified immunity,

> "we look to cases from the Supreme Court and [the United States Court of Appeals for the District of Columbia], as well as to cases from other courts exhibiting a consensus view," *Johnson v. District of Columbia*, 528 F.3d 969, 976 (D.C. Cir. 2008)—if there is one. The facts of such cases need not be " materially similar . . . but have only to show that the state of the law at the time of the incident gave the officer fair warning that his alleged misconduct . . . was unconstitutional." *Id.* (quoting *Hope v. Pelzer*, 536 U.S. 730, 741, 122 S. Ct. 2508, 153 L.Ed.2d 666 (2002)).

*Bame,* 637 F.3d at 384 (internal quotation marks omitted); *see Pearson v. Callahan*, 555 U.S. 223, 243-44 (2009) (citing to state and federal court cases when discussing clearly established law).

Applying these principles to the present facts, there is no question that the law was clearly established at the time of the arrests.  For many decades preceding these arrests, District of Columbia law has consistently provided that probable cause to arrest for unlawful entry requires evidence that the alleged intruder knew or should have known, upon entry, that such entry was against the will of the owner or authorized agent.  *Bowman*, 212 A.2d at 611; *Jones,* 282 A.2d at 562-63; *Culp*, 486 A.2d at 1175-55; *Artisst v. United States*, 554 A.2d 327, 329-30 (D.C. 1989).

25

This is not a case where the parameters of the unlawful entry statute were so muddled that the officers were unable to "'reasonably . . . anticipate when their conduct may give rise to liability for damages.'"  *See Butera v. District of Columbia,* 235 F.3d 637, 652 (D.C. Cir. 2001) (citing *Anderson v. Creighton,* 483 U.S. 635, 646 (1987)).

The Defendants posit several theories about why the law was not really clearly established in these circumstances.  None of them have merit.

First, Defendants argue no clearly established law actually protected these Plaintiffs on that evening.  Under the "community caretaker" and/or "exigent circumstances" exceptions to the warrant requirement, the Defendants contend they had authority to enter the property where Plaintiffs, as social guests, had no reasonable expectation of privacy.  This argument is irrelevant because Plaintiffs do not challenge the lawfulness of the officers' warrantless entry onto the property or the initial detention of Plaintiffs during the on-scene investigation.  (*See* Doc. 33, Pls.' Summ. J. Resp. 12.)

Defendants boldly proceed to argue that social guests do not have the right to challenge Constitutional violations relating to seizures of their persons.  (Doc. 36, Defs.' Reply Br. 2.) However, Defendants are unable to direct the Court to any legal authority that social guests lack Constitutional protection from unreasonable seizures of their persons, as opposed to a reduced expectation of privacy with respect to searches or seizures of their property.  Thus, notwithstanding any purported diminished expectation of privacy as social guests, Plaintiffs most certainly retained their expectation that probable cause was necessary to effectuate each of their

arrests; Defendants' argument misses the mark. [14]

Defendants also suggest that their mistaken understanding of the law of unlawful entry supports their claim of qualified immunity.  However, "[i]f the law was clearly established, the [qualified] immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct."  *Harlow*, 457 U.S. at 818-19.  A police officer cannot escape liability "if he failed to observe obvious statutory or constitutional limitations on his powers or if his conduct was a manifestly erroneous application of the statute."  *Butz v. Economou*, 438 U.S. 478, 493-94 (1978).  Thus, "obvious" or "manifestly erroneous" mistakes of law cannot serve as the basis of a qualified immunity claim.  Nonetheless, the officers can still prevail if they claim "extraordinary circumstances and can prove that [they] neither knew nor should have known of the relevant legal standard.  But . . . the defense would turn primarily on objective factors."  *Harlow,* 457 U.S. at 819; *accord, Hobson v. Wilson*, 737 F.2d 1, 25 (D.C. Cir. 1984).

Here, the Defendants have not cited to any extraordinary circumstances which might have justified their failure to know the relevant law, and the Court is aware of no such circumstances.  The unlawful entry statute is not a complicated one, and it is a law that is fundamental to policing

---

[14]  Although the Court will not address them all in this opinion, the Defendants have made a number of other near-frivolous and marginally relevant arguments in their briefs,  For instance, the Defendants argue that the Plaintiffs could be arrested on a showing less than probable cause because they were social guests on the property and because the police officers were undertaking a "community caretaker" function, even though they have cited no authority, and this Court knows of none, that permits a traditional arrest on less than probable cause in such circumstances.  *See Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001) ("we confirm today what our prior cases have intimated: the standard of probable cause applies to all arrests, without the need to 'balance' the interests and circumstances involved in particular situations.") (some internal quotation marks omitted) (quoting *Dunaway v. New York*, 442 U.S. 200, 208 (1979)).

because it must be applied daily in various commercial and residential contexts.  All police officers, whether veteran or trainee, should be expected to know what it means.  Accordingly, Defendants' mistake about the law was not immunized, and the Court finds that no genuine issues of disputed fact exist with respect to whether the officers violated Plaintiffs' clearly established constitutional rights. [15]

3.       Defendants' Additional Qualified Immunity Arguments

The Defendants make two further arguments in support of summary judgment based on qualified immunity: reliance on the probable cause determination of fellow police officers (aka collective knowledge) and acting at the direction of supervisors.

(a)       The Collective Knowledge Doctrine and/or Fellow Officer Rule

The Defendants argue that they are entitled to qualified immunity because they collectively had sufficient information to support the arrests.  (*See* Doc. 31, Defs.' Summ. J. Brief 24-27.)  As this Circuit has recognized, "probable cause may emanate from the collective knowledge of the police, though the officer who performs the act of arresting or searching may be far less informed."  *United States v. Hawkins*, 595 F.2d 751, 752 n.2 (D.C. Cir. 1978); *accord Smith v. United States*, 358 F.2d 833, 835 (D.C. Cir. 1966).  In the present case, however, even considering all of the knowledge collectively held by all of the police officers, there was not

---

[15]  Defendants also contend they are protected by qualified immunity because "officers of reasonable competence" could disagree about whether there was probable cause to arrest the Plaintiffs.  (Doc. 30, Defs.' Response to Pls' Summ. J Mot. 5); *see Malley v. Briggs*, 475 U.S. 335, 341 (1986) (noting that immunity should be recognized if officers of "reasonable competence" could disagree).  However, officers of "reasonable competence" are expected to know the law.  *Harlow*, 457 U.S. at 818-19.  Because these officers erroneously believed that the question of whether Plaintiffs had been invited onto the property was irrelevant, there was no disagreement between "reasonably competent" officers.

sufficient information to establish probable cause.

Alternatively, the individual officers submit that pursuant to the "fellow officer rule," they are entitled to qualified immunity even in the absence of collective knowledge of probable cause because it was objectively reasonable for each of them to rely upon the probable cause determination of one or more of their fellow officers. *See Barham v. Ramsey*, 434 F.3d 565, 577 (D.C. Cir. 2006); *Bolger v. District of Columbia*, 608 F. Supp.2d 10, 24 (2009) (citing *Barham*, 556 F.3d at 850); *cf.*, Wayne R. LaFave, *Search & Seizure: A Treatise on the 4th Amendment* § 3.5 n.16 (4th ed.) (where police officer conveys some facts that indicate probable cause to a fellow officer, but non-conveyed facts would have defeated probable cause, the officer relying upon the conveyed facts may be immune from tort liability) (citing *Row v. Holt*, 864 N.E.2d 1011 (Ind. 2007)).

In the case at bar, the Court finds that Defendants Parker and Campanale have failed to show, by undisputed facts, that it was objectively reasonable for these officers to rely on the information communicated by others at the scene to support the arrests. While Parker was aware from other officers that the house was supposedly abandoned and there were people inside who should not be there, he knew first-hand that Peaches had given the Plaintiffs permission to enter the house. (Parker Dep. 15-18; Parker Interrog. 2,3.) Although he was informed by the purported owner that Plaintiffs did not have permission to occupy the property, Parker had no evidence that the owner had warned Plaintiffs not to enter or that Plaintiffs should have known entry was forbidden. (Parker Dep. 17-18; Parker Interrog. 2.)

Campanale was also aware from other officers that the house was supposedly abandoned and that there were people inside who should not be there, but he also knew that Peaches had

given the Plaintiffs permission to entertain at the house.  (Campanale Dep. 35; Campanale

Interrog. 2.)  He also knew first-hand that some of the Plaintiffs were present at the "invitation" of

someone else.  (Campanale Interrog. 9.)

Thus, even considering the evidence in the light most favorable to the Defendants, the

Court finds that Parker and Campanale are not entitled to qualified immunity on the Section 1983

claims arising out the unlawful entry arrests and, furthermore, that Plaintiffs are entitled to

summary judgment with respect to these two officers.

As to Defendants Espinosa, Newman and Khan, it is less clear from this record whether

they each specifically knew that the Plaintiffs had been invited onto the property.  While these

three officers did not make such admissions in the sworn documents found in the record, the

Defendants' own Statement of Undisputed Facts admits that "MPD Officers were told by some

social guests at 115 Anacostia Road, N.E. that a woman named 'Tasty' or 'Peaches' owned or

rented 115 Anacostia Road, N.E., and that she had given permission to hold a bachelor party on

site that night."  (SOF ¶ 27.)  Given this admission, these remaining three Defendants are not

entitled to summary judgment on the theory that they were solely relying upon the judgment of

their fellow officers and did not know themselves that probable cause was lacking due to the fact

that Peaches had invited Plaintiffs onto the property.  Likewise, the Plaintiffs are not entitled to

summary judgment, given the dispute in the evidence.  Therefore, the jury will have to decide

whether Espinosa, Newman and Khan were aware of the invitation, and that factual finding will

dictate whether those Defendants are entitled to qualified immunity based on the fellow officer

defense.

(b)        Acting at the Direction of Supervisory Officers

Similar to their contention based upon the fellow officer rule, Defendants assert that they

are protected by qualified immunity because they were ordered by superior officers to arrest

Plaintiffs.

However, our Circuit has specifically rejected the argument that immunity automatically

attaches were public officials violate a citizen's rights at the direction of higher authority.  In

*Hobson v. Wilson*, 737 F.2d 1 (D.C. Cir. 1984), FBI agents argued that they were protected by

qualified immunity because they had acted in compliance with the agency's approved policy

when they conducted counter-intelligence operations in violation of plaintiffs' First Amendment

rights.  Rejecting this argument, the Court reasoned "[i]n its most extreme form, this argument

amounts to the contention that obedience to higher authority should excuse disobedience to law,

no matter how central the law is to the preservation of citizens' rights. We have no hesitation in

rejecting this new argument." *Id.* at 67.  Our Circuit is not alone.  *See, e.g. Kennedy v. City Of*

*Cincinnati*, 595 F.3d 327, 336 (6th Cir. 2010) ("[S]ince World War II, the just following orders

defense has not occupied a respected position in our jurisprudence, and officers in such cases may

be held liable under § 1983 if there is a reason why any of them should question the validity of

that order." ) (citing *O'Rourke v. Hayes,* 378 F.3d 1201, 1210 n.5 (11th Cir. 2004) (internal

quotation marks omitted)); *Brent v. Ashley*, 247 F.3d 1294, 1305 (11th Cir. 2001) ("following

orders does not immunize government agents from civil rights liability); *Leonard v. Compton*,

No. 1:03CV1838, 2005 WL 1460165, at *6 (N.D. Ohio June 17, 2005) ("Just as an official policy

does 'not make reasonable a belief that was contrary to a decided body of case law,' . . . police

officers cannot obtain a license to violate clearly established constitutional rights from their

31

superior officers.") (citing *Wilson v. Layne*, 526 U.S. 603, 617 (1999)).

Some courts, however, have permitted a "just following orders" defense in limited, specific, circumstances. "While it is typically no defense for an officer to claim he was simply 'following orders,' plausible instructions from a superior or fellow officer can support qualified immunity where, viewed objectively in light of the surrounding circumstances, they could lead a reasonable officer to conclude that the necessary legal justification for his actions exists." *Harvey v. Plains Twp. Police Dept.,* 421 F.3d 185, 199 (3d Cir. 2005) (citing *Bilida v. McCleod*, 211 F.3d 166, 174-75 (1st Cir. 2000)).

In the present case, however, the only way that the superior officer's order to arrest the Plaintiffs could have been "plausible" and could have given the subordinate officer a reasonable basis to conclude that legal justification existed to arrest Plaintiffs for unlawful entry would have been if the subordinate officer was not aware of the invitation for Plaintiffs to enter the property. Consequently, the Court finds that any of the Defendants, including the two trainees (Espinosa and Khan), who were aware of the Plaintiffs' invitation to enter the property failed to act reasonably given the circumstances, despite Sgt. Suber's orders. *See Leonard*, 2005 WL 1460165, at *6 (finding both training officer and rookie officer could not "avoid liability by simply arguing" they were "following orders."). Accordingly, in this case, the final analysis of qualified immunity based upon the "following orders" argument is identical to that under the "fellow officer" rule. The argument does not prevent liability for Defendants Parker and Campanale, but Defendants Espinosa, Newman and Khan could prevail depending upon the jury's factual finding at trial.

4.    Defendants' Claim That They Did Not Personally Arrest Plaintiffs for
Unlawful Entry Is Unavailing

Although Defendants admit their names appeared on Plaintiffs' arrests reports, (Doc. 31,

Defs.' Summ. J. Br. 8), Defendants claim there is no evidence they personally arrested the

Plaintiffs and, therefore, they are not liable for the Section 1983 claim.  The Court is unpersuaded

by this argument.  As an initial matter, two of the officers (Campanale and Newman) admit that

they each arrested one of the Plaintiffs.   (Campanale Dep. 35, 37; Newman Dep. 15-16.)

With respect to the three remaining officers, Khan, Espinosa and Parker, they cannot

avoid liability simply by pointing a finger at the other officers on the scene.  "One who directs or

assists an unlawful arrest may be liable."  *Gordon v. Degelmann*, 29 F.3d 295, 298 (7th Cir. 1994)

(citing *Kibourn v. Thompson*, 103 U.S. 168, 200 (1880)).  As explained by the Seventh Circuit:

> Federal common law principles of tort and damages govern recovery under section
> 1983. It is axiomatic that where several independent actors concurrently or
> consecutively produce a single, indivisible injury, each actor will be held jointly and
> severally liable for the entire injury. Restatement (Second) of Torts, §§ 875, 879. In
> such a case the injured party may proceed to judgment against any or all of the
> responsible actors in a single or in several different actions.  *See* Restatement
> (Second) of Torts, § 882.

*Watts v. Laurent*, 774 F.2d 168, 179 (7th Cir. 1985) (citations to cases omitted); *see also Burns v.*

*Reed*, 500 U.S. 478, 484 (1991) (Section 1983 "is to be read in harmony with general principles

of tort immunities and defenses rather than in derogation of them.") (citations and internal

quotation marks omitted); Michael Avery, David Rudovsky & Karen M. Blum, *Police*

*Misconduct Law and Litigation* § 12.36 (3d ed.) (explaining joint and several liability in the

context of Section 1983 claims).

The Court finds that Officers Khan, Espinosa and Parker are subject to liability as joint

tortfeasors. It is undisputed that all three officers were present on the scene, all three were present

in the house during at least some portion of the investigation, and all three were actively involved in the matter at some juncture.  Parker admittedly spoke with Peaches and Hughes, as well as one or more Plaintiffs who told the officers that Peaches had given Plaintiffs permission to occupy the property.  (Parker Dep. 15-18: Parker Interrog. 2, 3.)  Parker also provided Sgt. Suber with the results of the investigation, observed officers making arrests, and provided investigative information to the officers who "took" the arrests.  (Parker Dep.  20.)  Khan admitted signing and completing a portion of six or seven arrest forms, while Espinosa admitted signing and completing a portion of three forms.  (Khan Dep. 12; Khan Interrog. 2, 7, 9; Espinosa Interrog. 2; Espinosa Dep. 12, 21.) [16]  Thus, the officers' own testimony establishes that they "actively participate[ed] in a wrongful act, by cooperation or request, or . . . lend[ed] aid" to the arresting officers.  *See* Police Misconduct § 12.36; *see also James by James v. Sadler*, 909 F.2d 834 837 (5th Cir. 1990) (reversing summary judgment for local police officers who provided back-up during illegal search by narcotics agents because role of the local officers was "integral to the search").  As such, Khan, Espinosa and Parker are jointly and severally liable with whomever actually placed the Plaintiffs in handcuffs and transported them to the police station.

Defendant's reliance on *Fernandors v. District of Columbia*, 382 F. Supp.2d 63 (D.D.C. 2005) is misplaced.  In *Fernandors*, the District of Columbia conceded that the two officers who first arrived on the scene and apprehended the plaintiff were not entitled to qualified immunity because of disputed factual issues.  *Id.* at 71.  The Court held that a third officer was entitled to qualified immunity on a false arrest claim because he arrived at the scene after the apprehending

---

[16]  The Court notes that although Khan claims he did not physically arrest any of the Plaintiffs, (Khan Interrog. 2, 19), Parker testified that he saw Khan make an arrest.  (Parker Interrog. 12, 20.)

officers and it was undisputed that he did not make the determination to arrest the plaintiff.  *Id*. at

71-74.   Indeed, he possessed no information about the circumstances that supported the arrest.

*See id*. at 72-73.

In contrast, Khan, Espinosa and Parker saw the events unfold and observed the results of

the investigation on the scene.  As such, either they had first-hand knowledge that probable cause

did not exist to arrest Plaintiffs or they had enough information to question whether probable

cause existed.  Thus, the facts of the present case are vastly different from the facts in

*Fernandors*.

Rather, the instant case is more like *Dubner v. City and County of San Francisco*, 266

F.3d 959 (9th Cir. 2001).  In *Dubner*, one of the officers on the scene signed the plaintiff's arrest

form and admitted making arrests during a mass protest, but could not remember whether she had

arrested the plaintiff.  *Id*. at 964.  At the end of trial, the court dismissed plaintiff's unlawful arrest

claim because she had no evidence that the officer who signed the arrest form had actually made

the arrest.  *Id*. at 964-65.  The Ninth Circuit Court of Appeals reversed, explaining that while

plaintiff bore the burden of proving the unlawful arrest, the burden of production then shifted to

the defendant to provide evidence that the arresting officers had probable cause.  *Id*. at 965  "This

minimal burden shifting forces the police department, which is in the better position to gather

information about the arrest, to come forward with some evidence of probable cause."  *Id*.  The

Court reasoned that shifting the burden of production to the defendants, prevented "this exact

scenario where police officers can hide behind a shield of anonymity and force plaintiffs to

produce evidence that they cannot possibly acquire."  *Id*.  The Ninth Circuit's application of this

burden shifting approach in Section 1983 false arrest cases is consistent with the law of the

United States Court of Appeals for the District of Columbia.  *See Dellums v. Powell*, 566 F.2d

167, 175 (D.C. Cir. 1977) (explaining that once a plaintiff establishes that she was arrested

"without process," the "burden then shifts to the defendant to justify the arrest.")

      Finally, given the unique circumstances presented in the instant case, it would not be in

the interest of justice to grant summary judgment to police officers who signed the arrest forms

but  are now unwilling to take responsibility for the arrests.  *See Rauen v. City of Miami*, No. 06-

21182-CIV, 2007 WL 686609, at *4-5 (S.D. Fla. March 2, 2007) (denying motion to dismiss

where plaintiffs could not identify individual officers involved in arrest of protestors because the

officers at the scene wore identical riot gear, their faces were covered by shields and their

uniforms had no identifying information).  Accordingly, Defendants' assertion that they did not

arrest Plaintiffs does not justify dismissal of Plaintiffs' claims.


**B.**      **Disorderly Conduct Arrests** & **Defendants' Absolute and Qualified Immunity
Defenses**

      As noted above, the Section 1983 unlawful arrest claim has been brought against five

police officers, Edwin Espinosa, Jason Newman, Anthony Campanale, Andre Parker and Faraz

Khan.  This claim was not brought against the City, Lieutenant Netter (who ordered the arrests),

or the representatives within the office of the Attorney General who advised Netter to order the

arrests.  The five police officer Defendants contend they are entitled to summary judgment on the

Section 1983 claim based upon the disorderly conduct arrests because the Attorney General's

office made the decision to "charge" the Plaintiffs and, because charging is a discretionary

function of the executive branch, the arrests are therefore protected by absolute immunity.  This

argument is without merit.

The Supreme Court held over twenty years ago that a prosecutor does not enjoy absolute immunity from a Section 1983 action challenging her erroneous advice to the police that there was probable cause to arrest the plaintiff, because "the prosecutorial function of giving legal advice to the police" is not the type of adversarial prosecutorial activity that merits absolute immunity protection. *Burns v. Reed*, 500 U.S. 478, 496 (1991). Thus, the fact that in the instant case a prosecutor advised the police that there was probable cause to arrest the Plaintiffs for disorderly conduct does not clothe the police officers with absolute immunity because they relied upon such advice. *See id.*; *see also Atherton v. District of Columbia Office of Mayor*, 567 F.3d 672, 683 (D.C. Cir. 2009) (citing *Burns*, 500 U.S. at 492-96).[17] Accordingly, reliance by police officers upon the advice of a representative from the Attorney General does not provide absolute immunity, but it does factor into the qualified immunity analysis, along with all of the other facts and circumstances. *Id.*; *see also Kelly v. Borough of Carlisle*, 622 F.3d 248, 254-55 (3d Cir. 2010) (applying qualified immunity standard and rejecting argument that seeking advice of prosecutor makes action by police officer per se objectively reasonable) (citing *Cox v. Hainey*, 391 F.3d 25, 34 (1st Cir. 2004)).

Apparently because the Defendants placed complete reliance on their absolute immunity argument, they have failed to argue or brief how they are entitled to qualified immunity for the Section 1983 claim based on the unlawful disorderly conduct arrests. Thus, the Defendants,

---

[17] The cases cited by Defendants in support of the proposition that absolute immunity protects prosecutorial "charging decisions" are inapposite, because the plaintiffs here are challenging their arrests, rather than their charges, and charging is the act of lodging of a criminal complaint. *See Marrow v. United States*, 592 A.2d 1042, 1046 (D.C. 1991) ("an individual is 'charged' . . . when a criminal complaint . . . and warrant . . . are signed by a judge and filed . . ."); *accord Burns*, 500 U.S. at 494 ("absolute prosecutorial immunity [is justified] only for actions that are connected with the prosecutor's role in judicial proceedings").

despite six rounds of briefings on the two motions for summary judgment, have made no effort to set forth what specific facts were relied upon by the police officers or the Attorney General's representative in deciding to arrest the Plaintiffs for disorderly conduct, how any such facts established probable cause to arrest the Plaintiffs for disorderly conduct, or why the Defendants' actions were objectively reasonable.  Therefore, even if the Court were to construe the Defendants' motion for summary judgment as including a qualified immunity argument as to this claim, the Court is without any basis to grant judgment for Defendants.  Accordingly, the defense motion for summary judgment on the Section 1983 disorderly conduct arrests is denied.[18]

Indeed, the Court finds that Plaintiffs' motion for summary judgment is due be to granted, in part, because qualified immunity does not apply to any officers who participated in the disorderly conduct arrests.  The advice of the prosecutor's office does not make these arrests objectively reasonable and there is no evidence in the record that Netter or the OAG representative attempted to ascertain any specific information about the level, type, or duration of noise at the house or who was responsible for creating the "loud voices" before ordering the mass arrest of every single person who happened to be in the house when the police arrived.

Furthermore, Defendants have made no attempt to proffer evidence that probable cause existed as to each Plaintiff, as required by the Fourth Amendment.  *See Barham*, 434 F.3d at 573 ("No reasonable officer in Newsham's position could have believed that probable cause existed to order the sudden arrest of every individual in Pershing Park.  Even assuming that Newsham had

---

[18] The Defendants assert that none of them participated in the disorderly conduct arrests. However, each of the collateral/bond receipts submitted for the record list one of the five Defendant officers as the arresting officers on the disorderly conduct charges, thereby precluding summary judgment against the Plaintiffs on this ground.  (*See* Doc. 38 at 5-9.)

probable cause to believe that some people present that morning had committed arrestable offenses, he nonetheless lacked probable cause for detaining everyone who happened to be in the park."). It will be up to the jury to determine which Defendant officers, if any, are liable for having participated in the disorderly conduct arrests.

## V.  STATE LAW FALSE ARREST CLAIMS

The District of Columbia is liable, as *respondeat superior*, for the tort of false arrest, if an MPD officer commits the tort of false arrest while acting within the scope of his employment. *See generally Wade v. District of Columbia*, 310 A.2d 857, 863 (D.C. 1973) (en banc); *see also Dellums v. Powell*, 566 F.2d 216, 223 (D.C. Cir. 1977) (citing *Wade*, 310 A.2d at 857). As discussed above, the Court finds that each of the Plaintiffs was arrested without probable cause. However, because the liability of the City is derivative of the liability of the police officer, any individual defenses available to the police officer will also preclude judgment against the City. [19] *See Minch v. District of Columbia,* 952 A.2d 929, 938 (D.C. 2008).

"Under District of Columbia law, a police officer may justify an arrest by demonstrating that "(1) he or she believed, in good faith, that his or her conduct was lawful, and (2) this belief was reasonable." *Scott v. District of Columbia*, 101 F.3d 748, 754-55 (D.C. Cir. 1996) (citing *District of Columbia v. Murphy*, 631 A.2d 34, 36 (citations and internal quotation marks omitted),

---

[19] In their brief, the Plaintiffs clarify that they are asserting Count II against the District of Columbia, as well as against the officers in both their official and individual capacities. (Doc. 33, Pls.' Summ. J. Response 4.)

The Court will dismiss the state law claims asserted against the officers in their official capacities because such claims are duplicative of the claims asserted against the District of Columbia. *See Atchinson v. District of Columbia,* 73 F.3d 418, 424 (D.C. Cir. 1996).

*on reh'g*, 635 A.2d 929 (D.C. 1993)); *see* Stevens, Ed., *Standardized Civil Jury Instructions for the District of Columbia* § 18.03 (2011 Rev. Edition).  Thus, even if an arrest is unlawful, a defendant may avoid liability if he can show that he had a subjective good faith belief that his conduct was justified and that subjective belief was reasonable.  *See Scott,* 101 F.3d at 753-55 (reversing jury verdict against two arresting officers who had a reasonable, good faith belief that Plaintiff was properly in their custody and who could not have known from their observations that the arrest was not authorized under District of Columbia law) (citing *Murphy*, 631 A.2d at 36); *Lisner v. Smith*, 254 F. Supp.2d 89, 96-100 (D.D.C. 2003) (granting summary judgment for defendant officers where officers arrested plaintiff based on an ATM video recording time-stamp because the AUSA had made the final probable cause determination and the officers had a good faith reasonable belief that the time-stamp was accurate, although they later discovered it was not); *see also Weishapl v. Sowers,* 771 A.2d 1014, 1020-21 (D.C. 2001); *Minch v. District of Columbia*, 952 A.2d 929, 937-38 (D.C. 2008).  In deciding whether the officer acted in good faith, the evidence must be viewed from the perspective of the officer, not from the plaintiff's perspective.  *Civil Jury Instructions* § 18.03.

A.      **Unlawful Entry**

Defendants argue that they are entitled to summary judgment on the state law unlawful entry claim because a reasonable officer could have believed, in good-faith, that the arrests were appropriate given the statements by the purported owner that he had not given the Plaintiffs or Peaches permission to occupy the premises.  (Doc. 31, Defs.' Summ. J. Brief 29.)  If the unlawful entry statute justified arrest solely based upon evidence that Plaintiffs were discovered on the

property without permission from the owner, then all of Defendants could rely upon the good-faith defense.  However, as set forth above, the statute requires more.

It is well settled that where a police officer acts on the basis of an erroneous understanding of the statute, the officers' subjective beliefs are not reasonable.  *See Dellums v. Powell*, 566 F.2d 167, 176-77 (D.C. Cir. 1977) ( stating, while applying the subjective, good-faith belief test, that "an arrest may not be 'justified by ignorance or disregard of settled, indisputable law.'") [20] Accordingly, Plaintiffs are entitled to summary judgment on the common law false arrest claim based upon unlawful entry as to the Defendant District of Columbia and as to those individual Defendant officers, Parker and Campanale, who knew or should have known prior to the arrest that the Plaintiffs had been invited to enter the property, but failed to recognize the relevance of that information.  Where the officers knew of the invitation to the Plaintiffs, the Court finds that their belief that the unlawful entry arrests were proper was neither bona fide nor reasonable. *Compare*, *District of Columbia v. Tulin*, 994 A.2d 788, 800 (D.C. 2010) (court found that where the defendant police officer had a bona fide, but mistaken, belief that the arrest was proper, she was the lowest ranking person on the scene, and she was directly advised to arrest the plaintiff by a higher ranking officer, she had a reasonable, subjective good-faith belief that entitled her to the defense).

---

[20]  Although the Court in *Dellums v. Powell*, 566 F.2d 167, 176-77 (D.C. Cir. 1977), reached this holding in a Section 1983 false arrest case, the analysis is still applicable to a common law false arrest claim.  *Dellums* was handed down under prior Section 1983 law which provided that officers were entitled to qualified immunity where their conduct was objectively reasonable or where they had a subjective good faith belief that their conduct was lawful.  *See Harlow v. Fitzgerald*, 457 U.S. 800, 815-20 (1982).  In 1982, five years after *Dellums*, the United States Supreme Court rejected the subjective portion of the qualified immunity test for federal claims.  *Harlow*, 457 U.S. at 820.

As with the § 1983 unlawful entry claim, the jury must decide the extent to which Officers Newman, Khan and Espinosa knew Plaintiffs had been invited to the house.

**B.      Disorderly Conduct**

With respect to the disorderly conduct charge, as discussed above, the Court finds that the Plaintiffs were arrested without probable cause.  Because there is a factual dispute regarding whether the defendant officers were involved in the arrests for that charge, both motions for summary judgment as to the claims against the individual Defendants must be denied.   It will be up to the jury to determine which individual police officer Defendants participated in the disorderly conduct arrests.

The District of Columbia was named as a Defendant to this claim, and the city is potentially liable under *respondeat superior* even if none of the named Defendant police officers are held liable because a city employee, Lt. Netter, ordered the arrest of the Plaintiffs.  Thus, the District is liable for false arrest unless it can show that Netter had a subjective belief that the arrest was justified and that such a belief was reasonable.  However, the District failed in its pleadings supporting its summary judgment motion or in opposition to Plaintiffs's motion to submit a declaration, deposition testimony, or any other direct evidence about the state of mind of Netter or those with whom he consulted.  Thus, the District has failed to create a disputed issue of fact as to whether Netter's order to arrest the Plaintiffs was subjectively reasonable and in good faith, as the undisputed evidence in the record indicates instead that it was "the product of the government's willful ignorance, investigative negligence, or [was] otherwise unreasonable." *Liser v. Smith,* 254 F. Supp.2d 89, 97 (D.D.C. 2003).  Therefore, the Court grants the Plaintiffs'

42

motion for summary judgment on the disorderly conduct false arrest claim as asserted against the District of Columbia.

## VI.  NEGLIGENT SUPERVISION CLAIM

The negligent supervision claim has been brought solely against Defendant District of Columbia.  (Doc. 33, Pls.' Summ. J. Response 4.)  The District of Columbia courts have adopted the following Restatement of Agency provision with respect to employer liability for negligent supervision:

> A person conducting an activity through servants or other agents is subject to liability for harm resulting from his conduct if he is negligent or reckless:
>
> (a)      in giving improper or ambiguous orders o[r] in failing to make proper regulations; or
>
> (b)      in the employment of improper persons or instrumentalities in work involving risk of harm to others;
>
> (c)      in the supervision of the activity; or
>
> (d)      in permitting, or failing to prevent, negligent or other tortious conduct by persons, whether or not his servants or agents, upon premises or with instrumentalities under his control.

Restatement (Second) of Agency § 213 (1958), *cited in District of Columbia v. Tulin*, 994 A.2d 788, 795 (D.C. 2010) (false arrest case involving liability of the City for conduct of supervisory police officer).

Applying the Restatement to the facts in the instant case and viewing those facts in the light most favorable to the District, the Court finds that the Plaintiffs have proven their claim for negligent supervision.  For the reasons outlined above, the Court finds that the undisputed evidence shows that both Netter and Suber gave "improper or ambiguous orders," and each

supervisor "permitt[ed] or faile[ed] to prevent" negligent conduct by their subordinate officers. *See* Restatement (Second) of Agency § 213(a), (d).

The District proffers two arguments in support of its defense, neither of which is persuasive. First, the District argues it cannot be held liable for negligent supervision in the absence of some antecedent act that put the District on notice that its employees had previously committed torts or acted in an incompetent manner. *See DaKa v. McCrae*, 839 A.2d 682, 693 (D.C. 2003) (liability for negligent supervision requires antecedent proof of a tort committed by the supervised employee); *Brown v. Argenbright Sec., Inc.*, 782 A.2d 752, 760 (D.C. 2001). ( "To invoke this theory of liability it is incumbent upon a party to show that an employer knew or should have known its employee behaved in a dangerous or otherwise incompetent manner, and that the employer, armed with that actual or constructive knowledge, failed to adequately supervise the employee.") (citation omitted). This antecedent act requirement is not absolute, however.

In *District of Columbia v. Tulin*, 994 A.2d 788, 793-97 (D.C. 2010), plaintiff obtained a negligent supervision jury verdict based on the conduct of two supervisory police officers, not based upon evidence of an antecedent act by the subordinate officer. The two supervisors in *Tulin* authorized an arrest without obtaining "critical" information needed to establish whether the arrest was lawful. *Id*. at 797. Relying on the Restatement, the Court upheld the jury verdict for the plaintiff and explained that "supervisors can surely be negligent by not informing themselves properly and by thus authorizing or failing to prevent an unlawful arrest." *Tulin*, 994 A.2d at 793-97.

*Tulin* clearly allows for a negligent supervision claim without an antecedent act. This

approach makes perfect sense in cases such as this one, where a supervisory official directs a subordinate employee to act in the supervisor's presence.  For this tort, the focus is on the supervisor's ability and responsibility to manage or control the subordinate employee.  *Compare Brown*, 782 A.2d at 759-60 (upholding summary judgment for defendant supermarket on a claim of negligent supervision, in part, because no person with supervisory authority saw the incident at issue or had an opportunity to stop it).  Indeed in *Tulin*, the Court explained that a

> jury could reasonably find that the District, through [the two Sergeants], was negligent in its duty to supervise [the arresting officer] and to protect Mr. Tulin from a wrongful arrest. . . . [T]he jury could [have] conclude[d] that . . .  the sergeants at the scene should have recognized that the investigation was inadequate and that the arrest was unlawful, but that they nevertheless failed to prevent Officer McKoy from making it.

994 A.2d at 800.  Applying the Restatement provision and the reasoning from *Tulin* to the facts of the case at bar, the Court finds that the District is not entitled to summary judgment for negligent supervision because the unlawful arrests were ordered by high level officials who knew or should have known that probable cause was lacking for these arrests.

The District next argues Plaintiffs' negligent supervision claim fails because Plaintiffs do not have expert testimony to establish the requisite standard of care.  Defendant cites three cases for the proposition that expert testimony is essential where negligent operations, supervision, and training of police officers are at issue.  *See Linares v. Jones*, 551 F. Supp.2d 12, 20 (D.D.C. 2008); *Cotton v. District of Columbia*, 541 F. Supp.2d 195, 207 (D.D.C. 2008); *Parker v. Grand Hyatt Hotel*, 124 F. Supp.2d 79, 90 (D.D.C. 2000).  These cases do not, however, hold that expert testimony is required in all police negligent supervision cases.

District of Columbia law provides that "[e]xpert testimony is required . . . where the subject presented is 'so distinctly related to some science, profession or occupation as to be

45

beyond the ken of the average layperson.'" *Beard v. Goodyear Tire & Rubber Co.*, 587 A.2d

195, 200 (D.C. 1991) (citation omitted).  On the other hand, "[w]here negligent conduct is alleged

in a context which is within the realm of common knowledge and everyday experience, the

plaintiff is not required to adduce expert testimony . . . ."  *Id.* (citations omitted).  As this Circuit

has recognized, "the factual context matter[s]," when determining the need for expert testimony

under District of Columbia law.  *Godfrey*, 559 F.3d at 573.

The decision in *Tulin* supports a finding that expert testimony is not required in this case.

994 A.2d at 794-97.  As noted above, *Tulin* involved supervising officers whose failure to obtain

"critical" information at an accident scene led to an unlawful arrest.  *Id.* at 796-97.  For example,

they failed to obtain information regarding the speed of two vehicles and the distance between the

vehicles prior to a rear end collision.  *Id.* at 795-96.  Citing the simple road safety laws relevant to

the accident, the Court held that the case was not one where "lay jurors would be unable to grasp

the issues without expert assistance."  *Tulin*, 994 A.2d at 795.

Similarly, the instant Court finds that an impartial trier of fact can determine, without the

aid of an expert, whether Suber, Netter and the OAG breached the standard of care by directing

the defendant officers to arrest Plaintiffs.  *See Godfrey*, 559 F.3d at 573 (upholding finding that

expert testimony was not required where the supervisor was present when the act was committed

and the supervisor had both the authority and ability to "supervise or control [the subordinate's]

behavior").  As in *Tulin*, the statutes here are not complicated and the duty to conduct a proper

investigation, as well as the duty to uphold that law, are not "distinctly related to some science,

profession or occupation as to be beyond the ken of the average layperson."  *See Beard*, 587 A.2d

at 200.

Accordingly, Plaintiffs' failure to proffer expert testimony is not fatal to their negligent supervision claim.  Indeed, Plaintiffs' motion for summary judgment will be granted on said claim and Defendants' motion for summary judgment must be denied.


## VII. CONCLUSION

For the reasons set forth above, the Court finds that:

Count I: Section 1983 False Arrest Claims for Unlawful Entry and Disorderly Conduct

a)  Defendants' Motion for Summary Judgment will be granted as it relates to Plaintiffs' Section 1983 claims asserted against the officers in their official capacities.  Said claims against defendants Espinosa, Newman, Campanale, Parker and Khan in their official capacities will be dismissed with prejudice.

b)  Plaintiffs' Motion for Summary Judgment will be granted with respect to Plaintiffs' Section 1983 unlawful entry false arrest claims asserted against Defendants Anthony Campanale and Andre Parker in their individual capacities.

c)  In all other respects, the parties' Motions for Summary Judgment with respect to Count I will be denied.


Count II: State Law False Arrest Claims for Unlawful Entry and Disorderly Conduct

a)  Defendants' Motion for Summary Judgment will be granted as it relates to the state law false arrest claims asserted against the individual officers in their official capacities.  Said claims against Defendants Espinosa, Newman, Campanale, Parker and Khan in their official capacities will be dismissed with prejudice.

47

b)      Plaintiffs' Motion for Summary Judgment will be granted with respect to the state law <u>unlawful entry</u> false arrest claims asserted against the Defendants District of Columbia, Campanale and Parker.

c)      Plaintiffs' Motion for Summary Judgment will be granted with respect to the state law disorderly conduct false arrest claim asserted against the Defendant District of Columbia.

d)      In all other respects, the parties' Motions for Summary Judgment with respect to Count II will be denied.

<u>Count III: State Law Negligent Supervision Claim</u>

Plaintiffs' Motion for Summary Judgment will be granted with respect to the state law negligent supervision claim against Defendant District of Columbia  The District of Columbia's Motion for Summary Judgment on Count III will be denied.

SO ORDERED.

January 18, 2012

_____
Robert L. Wilkins
United States District Judge

48